

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| Heartland Home Finance, Inc., et al., ) | CASE NO. 1:05 CV 2659 |
| ) | |
| Plaintiffs, ) | JUDGE PATRICIA A. GAUGHAN |
| ) | |
| vs. ) | |
| ) | |
| Allied Home Mortgage Capital Corp., ) | **Memorandum of Opinion and Order** |
| ) | |
| Defendant. ) | |

## INTRODUCTION

This matter is before the Court upon Defendant's Motion for Summary Judgment (Doc. 57). This case involves the alleged disclosure of trade secret information. For the reasons that follow, the motion is GRANTED.

## FACTS

Plaintiffs, Heartland Home Finance, Inc. ("Heartland" or "plaintiff") and Mortgage Data, Inc. d/b/a Active Response Marketing ("ARM") filed this lawsuit against defendant, Allied Home Mortgage Capital Corporation in state court. Defendant removed the action to this Court on the basis of diversity of citizenship. Heartland and defendant are mortgage brokers. ARM is a

1

telemarketer for mortgage brokers, including Heartland. It appears that these two entities are related in some fashion.

This facts of this case are largely undisputed. Timothy Rennert ("Rennert") was employed by plaintiff from 1997 until 2001. After his departure, he became a branch manager for defendant.

Both plaintiff and defendant acquired new business through the use of internet and telemarketing leads. Plaintiff entered into contracts with internet "lead" providers. These companies acquired information from consumers through the internet and, in turn, sold the information to "three or four" mortgage brokers for ten dollars per lead. Telemarketing leads appear to consist of records that are developed through a records review process. ARM sold telemarketing leads to Heartland and third parties.

Plaintiff purchased approximately 5,000 to 7,500 internet leads per week. The lead providers electronically delivered the leads to one of ARM's computers. (Milton. Dep. at 14). Thereafter, the leads were downloaded and printed to separate lead forms by Eileen Milton, an ARM employee. (Miilton Dep. at 21). The leads were then sorted and faxed to various Heartland branches. (Milton Dep. at 22).

After Milton faxed the lead sheets, the branch offices disbursed the leads to their loan officers, who were expected to contact the individuals within 24 hours.

After sending the faxes, the lead sheets were placed in plastic mail bins in Milton's office. (Milton Dep. 23). For a period of time during Milton's employment, an outside vendor picked up the mail bins and took them to be encoded offsite. (Milton Dep. 30-32). Thereafter, the vendor returned the bins with a diskette containing the stored leads. It appears that the vendor destroyed the hard copies of the lead sheets. (Dunsing Aff. par. 20). The disks were maintained by an ARM

2

employee.

At some point in time after Milton commenced employment with ARM, she took over the role of the outside vendor.[1] Rather than have the outside vendor pick up the bins, Milton filed them in filing cabinets located at ARM. (Milton Dep. at 24-25). She filed the leads at least once a month. (Milton Dep. at 25). The filing cabinets containing the lead sheets were locked. ARM's receptionist kept the keys to the cabinet. According to Milton, the receptionist kept the keys in his desk, which was always locked.

On May 7, 2003, Heartland suspected that mortgage leads were being stolen. Accordingly, Jay Dunsing, Heartland's president, filed a fictitious application with an internet lead provider. He was subsequently contacted by three mortgage brokers, including Heartland and the Allied branch operated by Rennert. Dunsing contacted defendant directly and relayed his concerns regarding the theft of internet leads. Thereafter, defendant conducted an internal audit of Rennert's branch. Contemporaneous notes of the audit were taken by Kathy Loomer, the Allied employee conducting the audit. After the audit, Allied terminated Rennert's branch. According to Loomer, she did not find any "conclusive" evidence that there was a problem at the branch, but Allied decided to take proactive measures in light of Heartland's concerns.

Thereafter, plaintiffs filed this lawsuit asserting three claims for relief. Count one is a claim for misappropriation of trade secrets brought pursuant to O.R.C. § 1333.61. Count two alleges tortious interference with existing and prospective economic advantage. Count three is a

---

[1] The affidavit submitted by Heartland's president discusses the use of the outside vendor. It does not, however, indicate that ARM *stopped* using the vendor. Thus, it is slightly unclear whether ARM used the services of an outside vendor for the entire time period at issue.

3

claim for respondeat superior.

## STANDARD OF REVIEW

In accordance with Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323. A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In ruling upon the motion, the court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th

Cir. 1985). However, summary judgment should be granted if the party bearing the burden of proof at trial does not establish an essential element of its case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. 317).

## DISCUSSION

1.  Misappropriation of trade secrets

Defendant argues that the leads at issue in this lawsuit do not constitute trade secrets. In the alternative, defendant claims that plaintiffs' failure to protect the information destroys any "trade secret" status. Plaintiffs disagree, arguing that the lead sheets are trade secrets and they took reasonable steps to maintain the secrecy of the information.

Misappropriation of trade secrets is a recognized tort in Ohio for which damages may be obtained. *See Fred Siegel Co., LPA v. Arter & Hadden*, 707 N.E.2d 853, 861 (Ohio 1999). In order to prevail on a claim of misappropriation of trade secrets, a plaintiff must show by a preponderance of the evidence the following: (1) the existence of a trade secret; (2) acquisition of a trade secret as a result of a confidential relationship; and (3) unauthorized use of a trade secret. *Hoover Transportation Services, Inc. v. Frye*, 2003 WL 22128759 at **5 (6th Cir. Sept. 12, 2003).

The term "trade secret" is defined in Ohio Rev. Code § 1333.61(D) as follows:

(D) "Trade secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or **listing of names, addresses, or telephone numbers, that satisfies both of the following**:

(1) It derives **independent economic value**, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

5

> **(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.**

Ohio Rev. Code. § 1333.61(D) (emphasis added). Interpreting this statute, the Ohio Supreme Court has adopted the following factors in analyzing a trade secret claim:

> (1) The extent to which information is known outside the business; (2) the extent to which it is known to those inside the business; i.e, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. The Plain Dealer v. Ohio Dept. of Ins.*, 687 N.E.2d 661, 672 (Ohio 1997). *See also State ex rel. Besser v. Ohio State University*, 732 N.E.2d 373, 378 (Ohio 2000).

The Ohio Supreme Court has also explained that "[a]n entity claiming trade secret status bears the burden to identify and demonstrate that the material is included in categories of protected information under the statute and additionally must take some active steps to maintain its secrecy." *Besser*, 732 N.E.2d at 378. *See also Fred Siegel Co.*, 707 N.E.2d at 862. The concept of secrecy is critical to the determination of trade secret status, since "[o]nce material has been publicly disclosed, it loses any status it ever had as a trade secret." *State ex rel. Rea v. Ohio Dept. of Education*, 692 N.E.2d 596, 601 (Ohio 1998). The question of whether a particular knowledge or process is a trade secret is typically a question of fact to be determined by the trier of fact upon the greater weight of the evidence. *Fred Siegel Co.*, 707 N.E.2d at 862. *See also Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.*, 492 N.E.2d 814, 819 (Ohio 1986).

Upon review of the six relevant factors, the Court finds that defendant is entitled to summary judgment because the lead sheets are not trade secrets. The first factor, *i.e.*, the extent

to which the information is known outside the business weighs in favor of defendant. Plaintiffs do not dispute that at least three of their competitors purchased the leads bought by Heartland. As defendant points out, the contracts between the internet lead providers and their customers expressly provide the purchaser with the right to resell the information in any way it sees fit. Thus, this information is readily available in the marketplace. Although the Court recognizes that the information is not *publicly* available, it is disseminated well outside defendant's four walls. *See, e.g., Proctor & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 277 (Oh. Ct. App. 1st Dist. 2000)(distinguishing between data received from marketing firm, which was available to "any other company that could pay for it," and manipulation of that data in a unique way that could not be duplicated absent expenditure of vast amounts of time and money). Moreover, plaintiff itself disclosed the information to third parties, including Lake Data.

The Court further finds that the second factor, *i.e.*, the degree to which the information is known within the company, weighs in favor of defendant. The information was received by individuals employed by ARM, faxed around to many Heartland branches and utilized by many loan officers. Thus, a significant number of employees had access to the lead sheets. This is not the type of secret information accessible by only a few individuals.

This Court must also consider the degree of the precautions taken to guard the secrecy of the information in order to determine whether the lead sheets warrant trade secret protection.[2]

---

[2] Defendant argues that the failure to protect the secrecy of the lead sheets destroys any trade secret entitlement the information may have enjoyed. The Court finds that, rather than analyzing the degree of protection as an "exception," the Ohio Supreme Court requires it be addressed as one factor in determining whether the information is entitled to protection in the first instance.

7

Again, this factor weighs in favor of defendant. There is no indication that any ARM employee was subject to a confidentiality agreement, including Milton, who worked closely with the lead sheets. Plaintiff claims that the lead sheets were stored in a locked filing cabinet. Milton, however, testified that prior to filing the lead sheets, they were stored in plastic bins in her office for up to a month. Although she testified that she locked her office door upon leaving, she admits that she provided the bins to Lake Data, who removed them from the premises. Lake Data, like the ARM employees, was not subject to a confidentiality agreement. In addition, the president of ARM testified that several people had access to the keys to the filing cabinet. As defendant points out, assuming *arguendo*, Rennert obtained Heartland's lead sheets, he must have obtained them from ARM.[3] Surely plaintiff would be able to pinpoint that individual if adequate security measures were taken. Undoubtedly, plaintiff took some precautions regarding the lead sheets. For example, the email received from the internet lead providers containing the lead sheets was encrypted. In addition, plaintiff points out that Milton's computer was password protected. On the whole, however, the Court finds that these measures are insufficient to overcome the lack of security identified above.

With regard to the fourth factor, *i.e.*, the savings effected and the value to the holder in having the information as against competitors, the Court finds that this factor weighs against a finding that the lead sheets constitute trade secrets. As set forth above, the lead sheets were readily available to any competitor wishing to purchase the information. In fact, three

---

[3] The false internet lead was submitted by plaintiff in 2003, long after Rennert left his employment with Heartland. Thus, this is not a situation where an employee left his former employment and took trade secret information with him.

competitors actually purchased the internet leads along with plaintiff. With regard to the remaining factors, the Court agrees with plaintiff that the amount of money expended in acquiring the information is not insignificant. Presumably, it would require a competitor to make an equal expenditure in order to acquire the information. Cutting against this argument, however, is the fact that plaintiff's competitors do make these same expenditures and acquire the same information. Even if this factor weighs slightly in favor of plaintiff, the remaining factors weigh so strongly in favor of defendant that no reasonable juror could conclude that the lead sheets constitute trade secrets.[4]

Even assuming the lead sheets are protected trade secrets, the Court finds that plaintiffs' claim still fails as a matter of law. Plaintiffs fail to present sufficient evidence from which a jury could conclude that defendant obtained the trade secrets from ARM. As set forth extensively above, the lead sheets are available to any number of entities. Thus, even if defendant misappropriated leads, there is no way to tell *whose* leads were misappropriated. There is simply no evidence in the record tying Rennert to plaintiff. Rennert's employment terminated long before the alleged misappropriation occurred. Moreover, plaintiffs' own expert analyzed four of ARM's computers and concluded that there is no evidence that any lead information was sent to Rennert from these computers.

Plaintiffs argue that a comparison of the loans closed by Rennert's branch reveals that more than 50% of them were Heartland leads. In addition, plaintiffs offer an expert report purportedly showing "174 unique matches, where a customer" was found in both defendant's

---

[4] Although the parties give the definitions for both internet and telemarketing leads, their analyses both group these leads together. The Court analyzed the leads as they were presented by the parties.

"customer lists" and the lists sent by one of the internet lead providers.[5] Plaintiffs' argument misses the mark. Even if there was identical overlap between the loans Rennert's branch closed, the evidence is insufficient to survive summary judgment. Plaintiffs are not the sole possessors of this information. As plaintiffs readily admits, three of their competitors also purchase loans from the internet lead providers that are the subject of the comparison. There is simply no evidence indicating that defendant obtained this information from plaintiffs.[6]

Plaintiffs also claim that the notes of the audit conducted by Loomer are evidence that defendant misappropriated trade secrets. This Court disagrees. The notes indicate as follows,

> *Actual Response Marketing*
> Advertising/Leads working? Yes No
> What are they? *Mostly Ky, Va, Mass, Oh, Pa*
> *- Telemarketing, Internet, Telemarketing mailers* *Leads Results*
> *[SM A List]*
> *Create Loan Contact Leads to Reverse*
> *@ 8:00*
>
> Discuss other issues branch may have.
> What are they? *No*

---

[5] Defendant argues that the report may not be considered because it was not properly authenticated. Regardless, the Court finds that the report does not save plaintiff's claim.

[6] For these same reasons, the fact that Rennert may have contacted the fictitious "William Ringrose" is insufficient to withstand summary judgment. Plaintiff admits that, in addition to being contacted by Rennert and its own company, "William Ringrose" was contacted by a third competitor. If anything, this evidence tends to demonstrate that Rennert could have obtained the information from sources other than plaintiff. Further, the Court agrees with plaintiff that the testimony of Dunsing, in which he avers that he "confirmed" with lowermybills.com that defendant did not pay for the leads, is inadmissible hearsay.

10

Loomer, who left Allied in 2003, testified that she did not recall much about the audit. According to Loomer, other audits she conducted were much more serious. Although she noted that the branch possessed internet leads, she did not know where the leads came from. She presumes that the indication regarding "Active Response Marketing" in her notes means that the telemarketing leads came from ARM. It is undisputed, however, that Rennert purchased telemarketing leads from ARM after he was employed by defendant. There is simply no evidence even suggesting that any ARM telemarketing leads referenced in these notes were improperly obtained. Accordingly, defendant is entitled to summary judgment on count one.

2.     Tortious interference

In count two, plaintiff asserts a claim for tortious interference with existing and prospective economic advantage. Defendant moves for summary judgment on the grounds that there is no evidence that plaintiff had a "business relationship" with any of the individuals identified in the lead sheets. Defendant further argues that there is no evidence that it "interfered" with any such relationship. Plaintiff claims that there is a business relationship because "[it] considers a business relationship to exist upon receipt of the [lead] prospect."

The parties agree that a claim for tortious interference with prospective economic advantage includes the following,

(1) a business relationship;

(2) the wrongdoer's knowledge of that relationship;

(3) the wrongdoer's intentional and improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship;

11

(4) a lack of privilege; and

(5) resulting damages.

*Days Inn Worldwide, Inc. v. Sai Baba, Inc.*, 300 F.Supp.2d 583, 594 (N.D.Ohio 2004)(*citing Brookeside Ambulance, Inc. v. Walker Ambulance Serv.*, 678 N.E.2d 248 (Oh. Ct. App. 6th Dist. 1996)).

Upon review of the parties' argument and the relevant law, the Court finds that defendant is entitled to summary judgment on count two. The Court agrees with defendant that plaintiff fails to introduce evidence that a legally protected "business relationship" existed between plaintiff and the individuals identified on the lead sheets. As an initial matter, several companies contacted each lead vying for the business. Plaintiff thus had no expectancy interest in any particular lead. The Court further finds that plaintiff fails to introduce any evidence from which a jury could conclude that defendant's alleged misconduct, *i.e.*, wrongful receipt of the lead sheets, caused plaintiff any damages. Plaintiff admits that it closed loans for only two to five percent of all leads. There is simply no indication that "but for" defendant's conduct, plaintiff would have closed the loans at issue. Accordingly, for these reasons, defendant is entitled to summary judgment.

3. Respondeat superior

In count three, plaintiff asserts a claim for "respondeat superior." Respondeat superior, however, is not a cause of action. Rather, it is an avenue by which a plaintiff may seek redress from an employer for the wrongful conduct of its employees. Having concluded that plaintiff has no substantive claim against defendant, the Court finds that "count three" fails as a matter of law.[7]

---

[7] Defendant also argues that plaintiff may not obtain punitive damages. In addition, defendant claims that ARM cannot establish that it suffered damages. Having concluded that counts one and

12

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

---

two fail as a matter of law, the Court need not reach these arguments.